In re Harry ARDEN, Bankrupt.

**AMERICAN FINANCE CORPORATION, Plaintiff,**

v.

**Harry ARDEN, Defendant.**

**Bankruptcy No. BK–74–155.**

United States Bankruptcy Court, D. Rhode Island.

Dec. 30, 1975.

Ronald R. Gagnon, Pawtucket, R.I., for debtor.

Ronald J. Fishbein, Providence, R.I., for plaintiff.

**BANKRUPTCY JUDGE'S DECISION ON THE APPLICATION OF AMERICAN FINANCE CORPORATION TO HAVE ITS DEBTS DECLARED NON-DISCHARGEABLE**

ARTHUR N. VOTOLATO, Jr., Bankruptcy Judge.

The matter before the Court is the application of American Finance Corporation

(American) which seeks a determination that a certain debt, owed by the bankrupt to American prior to the filing of the petition in bankruptcy, is nondischargeable under Sec. 17(a)(2) of the Bankruptcy Act, 11 U.S.C. Sec. 35. This provides:

*Debts Not Affected by a Discharge.* (a) A discharge in bankruptcy shall release a bankrupt from all of his [or her] provable debts, whether allowable in full or in part, except such as. . . .

\* \* \* \* \* \*

(2) are liabilities for . . . obtaining an extension or renewal of credit in reliance upon a materially false statement in writing respecting his [or]her] financial condition made or published or caused to be made or published in any manner whatsoever with intent to deceive. . . . *Id.*

## TRAVEL

On April 29, 1974, Harry Arden filed a voluntary petition in bankruptcy in the United States District Court for the District of Rhode Island. American Finance Corporation was listed in the bankrupt's Schedule A–3 as an unsecured creditor in the amount of $2,392.07 [1].

On June 14, 1974, American filed its timely application to have said obligation declared nondischargeable, in the amount of $2,392.07, asserting that the bankrupt had forged his wife's signature as co-maker upon a promissory note, while representing to American that:

[T]he Signature thereon purporting to be that of the [bankrupt's wife] Sarah Arden, was in fact that of Sarah Arden, and that he, Harry Arden, had witnessed said signature and that said Sarah Arden intended to be, and did, sign said note as a co-maker thereon, intending to be jointly liable thereon. *Id.*

American's complaint also alleged that the bankrupt had affixed the false signature as a misrepresentation to induce the plaintiff to loan money to him and that American relied upon such misrepresentation and did loan money to him, which is still unpaid in whole or in part.

On August 9, 1974, the bankrupt filed an answer in which he denied the material and factual allegations in American's complaint. He stated that:

[T]he plaintiff's [American's] agent knew that the signature characterized as that of Sarah Arden was not the signature of Sarah Arden, did not rely upon the fact that the true Sarah Arden was to have signed said note nor was it in any way misled inasmuch as the representations made were true in that said signature did not purport to be the signature of Sarah Arden. *Id.*

With both American and the bankrupt represented by counsel, the matter was heard on the merits. At the conclusion of the hearing the parties were directed to and did file memoranda.

## FACTS

The resolution of the factual issues in this case depends in large part upon the reasonableness of American's customary business practice of granting loans based upon signatures of makers obtained out of the office. A review of the testimony and exhibits in detail establishes a reliable pattern of this finance company's policies and habits, which were adhered to in this case.

According to former Branch Manager William Patrick Hurley, it is American's practice to require co-signers unless the loans are small in amount (under $1,500.00 in most cases), or, "confidential". Exceptions may also be made if any applicant, though single or recently widowed, is a homeowner. The determination whether to require a second signature depends "upon the applying person's ability/stability or upon a credit check on him." Tr. at 9, 12/4/74 hearing. If a co-signer is required, financial information regarding the co-signer need not be supplied directly by him or her but can be, and often is, furnished to the company by the applicant who is present in the office.

---

**1.** American Finance Corporation actually holds a security interest in the household goods of the bankrupt.

About ten percent of the time, American allows the applicant to take the loan papers from its office, obtain the co-signer's signature, and return alone to complete the transaction. This may be done where the applicant is well known to the company, where there is illness, where the co-signer works all day and cannot come to the office, where the applicant has taken loan papers out previously, or where one employee tells the manager that the applicant is a good customer.

Where the applicant has obtained a co-signer's signature in absentia, he [or she] is required to "witness" that signature upon returning to the office. This is accomplished merely by having the applicant sign his [or her] name on a credit disclosure form next to or under the co-signer's purported signature. There is no text on the disclosure form stating that the applicant represents by signing that the other signature was actually made by the co-signer. Nor is the applicant generally asked specifically whether the signature is in reality that of the co-signer. Third parties are never required to sign as witnesses to the co-signer's signature.

In this case, the bankrupt had been doing business with American Finance Corporation and its predecessors, Coastal and Bell, for ten to fifteen years, mostly as a sole borrower. From October, 1971, to June, 1973, he engaged in at least five transactions with American, all of them renewals of partially unpaid prior loans. The loans were approved by either William Patrick Hurley or Wayne J. Hickey, respective managers of the company's branch office in Cranston. In spite of indications on his record that he had previously been forced to settle an unpaid debt with one of American's predecessors, the bankrupt was considered an excellent customer because "he made his payments every month without any problem." Deposition of Evelyn Bent at 9.

In September, 1971, the bankrupt applied for a $500.00 loan, while still owing approximately $850.00 on a previous loan. He was told that he would have to have a co-signer in order to get a renewal. Al-though company officials testified that they either did not hear or did not recall the following exchange, the bankrupt contends and I believe, that the following transpired: In substance, when the manager, Hurley, said that a co-signature was necessary, Arden replied that as for his wife, she knew nothing about it and that it would be impossible to get her signature. Hurley gave the note to Arden, saying that he had to come back with a signature. Arden went out and came back five minutes later with a signature ... and did so every time he was asked to bring in a signature. Tr. at 9, 8/21/74 hearing.

It is undisputed that the signatures were not genuine and that therefore the statement was false. In order to prevail under the Bankruptcy Act, American must have *relied* upon such statements in making the loans in question. There are many aspects of American's practices here that totally preclude the Court's finding that American acted reasonably in its alleged reliance. Based upon the following facts, which are adopted as findings, the Court concludes that the company knew or should have known at all times that the signatures were not genuine:

First, no employee at American ever saw, met, spoke with or otherwise communicated with the purported co-signer. Second, credit information regarding the co-signer was furnished solely by the bankrupt. There is no record of a separate, independent check by American. Third, after only perfunctory inquiries of American's cashier by managers Hickey and Hurley regarding Mr. Arden's past practice and credit reputation, the bankrupt was allowed to remove the papers from the office in order to obtain a signature. Yet, though Sarah Arden was allegedly "unable to come to the office," Deposition of Evelyn Bent at 11, the bankrupt was able each and every time to leave the office with the papers, "obtain" the signature, and return in the suspiciously brief space of five to fifteen minutes. Furthermore, cashier Bent recalled after persistent questioning that though she initially told Mr. Hurley on September 21, 1971, that the bankrupt had "always" taken the papers out to have them signed, in

actuality, the 1971 transaction was the first one where he was required to obtain a co-signer. Since there previously would have been no need to take any papers out because no outside signature was required, the inference is strong that the company allowed papers to go out of the office with little verification of prior practice.

In addition, though manager Hickey stated that he compared the two Sarah Arden signatures to see if they matched, he did so with the knowledge that the previous documents purportedly co-signed by the bankrupt's wife had also been taken out of the office.

Keeping all of the above in mind, the Court turns to the legal questions presented in the case.

## ISSUES

1. What is the burden of proof necessary to establish fraud under Sec. 17(a)(2) of the Bankruptcy Act?

2. Has the finance company carried its burden of establishing intent to defraud by the bankrupt and reasonable reliance by the company upon the misrepresentation?

## LEGAL ANALYSIS

A. The burden of proof is the federal standard of clear and convincing evidence of all elements of the plaintiff's case.

Recently this Court addressed at length the problems of selecting the applicable law and determining the proper standard of proof in dischargeability cases under Sec. 17 of the Bankruptcy Act. *In re Barlick*, 1 B.C.D. 412 (D.C.R.I., 1974). *Barlick* dealt with a petition to have a debt declared nondischargeable based upon an allegedly false financial statement. The plaintiff, Aetna Finance Company, asserted that the applicable standard in federal bankruptcy dischargeability cases was that established by the Rhode Island Supreme Court in *East Providence Loan Co. v. Ernest*, 103 R.I. 259, 264, 236 A.2d 639, 642 (1968), where the state court held that necessary reliance could be inferred from the circum-

stances attending the transaction in question without admitting direct evidence on the issue. This Court rejected Aetna's position and the state standard, finding that dischargeability was a federal question to which federal law must be applied. In *Barlick* it was noted that the Bankruptcy Act had been amended in 1970, to give the Bankruptcy Court exclusive and original jurisdiction over all dischargeability questions. *Id.*, 1 B.C.D. at 415. Because an important consideration before Congress when the amendment passed was the acknowledged need for uniformity in the application and principles of the Bankruptcy Act,[2] and because Sec. 17 contains "very narrowly defined exceptions to full discharge," *Barlick*, supra, 1 B.C.D. at 417, this Court interpreted the statute "to represent an intent by Congress to have uniform standards applied in accordance with the strict standards detailed, and not to leave the determination to the vagaries of state law." *Id.* This interpretation was further buttressed by the fact that "the mere grant of exclusive jurisdiction, subject to the required application of diverse state law, would frustrate rather than satisfy that Congressional aim of uniformity." *Id.*, 1 B.C.D. at 415. See also, *In re Campbell*, No. 56018 (unreported S.D. Ohio, 1972), 47 Am.Bankr.L.J. 41 (1973).

In accordance with *Campbell*, supra, this Court then held that the plaintiff-lender's burden of proof in dischargeability cases was that of "clear and convincing evidence of all of the elements of its case ..." *Barlick*, supra, 1 B.C.D. at 418. In accord: *In re Crawford*, 1 B.C.D. 1051 (N.D.Ohio 1975).

■ Although *Barlick* dealt with a false financial statement and the instant case concerns the genuineness of a signature upon loan documents, the *Barlick* analysis has been discussed at some length because the issue of burden of proof is identical. *Barlick*, *Campbell*, and *Crawford*, supra, are controlling here, and it is therefore held that American must prove the issues of

**2.** *Cf.* Sen.Rep. 91–1173, 91st Cong.2d Sess.    (9/16/70).

intent, materiality, and reliance by clear and convincing evidence.

B. American has not shown by clear and convincing evidence an intent to defraud on the part of the bankrupt.

■ Sec. 17(a)(2) of the Bankruptcy Act requires that fraudulent statements must be made with an "intent to deceive." *Id.* The fraud contemplated is actual. In re *Parks*, 1 B.C.D. 613 (E.D.Tenn., 1975). *Sweet v. Ritter Finance Co.*, 263 F.Supp. 540 (W.D.Va., 1967). As shown by the facts, supra, the bankrupt's assertions that American actually knew of and participated in the making of a false signature are denied by the finance company, without, however, the presentation of any specific proof on the latter's part. Several of American's employees simply stated that they did not recall or did not hear any conversation regarding Mrs. Arden's refusal to be co-signer. These bare statements, unsupported by specific evidence, are insufficient to carry the company's burden of proof. The relating of the bankrupt's conversation with manager Hurley, however, which the Court accepts as fact, does demonstrate that the bankrupt understood that American's agent was fully aware that Mrs. Arden would never sign the document, or even be told of it. At the same time, that official was encouraging the bankrupt to "get a signature" outside of the office. In the view of this Court, a prudent lender in the situation faced by American would either have denied the loan application in question, when advised that a required co-signer could not be obtained, or would have insisted that the required co-signer personally execute the document in the presence of a company employee in order to ensure that there was no duress or forgery involved in its attainment. Although in some circumstances, negligent conduct in business is excusable if committed unwittingly, it cannot be overlooked here where the complaining creditor has turned its back on an obvious red flag, and actually chosen to ignore it.

On the facts of this case, there is no evidence of intent by the bankrupt to defraud the company. To the contrary, the facts here indicate a mutual, cooperative effort between the lender and borrower to have this loan approved. The result in this case would be the same even if the bankrupt had the burden of proof on this issue. Since he does not, and since American has failed to demonstrate an intent to defraud by clear and convincing evidence, the Court finds that no such intent existed in any of the loan transactions in question.

C. American has not demonstrated by clear and convincing evidence that it relied upon the false signature in renewing the loans in question.

Sec. 17(a)(2) of the Bankruptcy Act specifically states that extensions or renewals of credit must be made "in reliance upon" false statements. *Id.* Assuming, for the purpose of this discussion only, that all of the other elements of fraud have been shown by clear and convincing evidence, American has not established reliance on its part.

■ Though the word "reasonable" does not appear in Sec. 17(a)(2) in connection with reliance, it cannot be disputed that reliance must of necessity be reasonable. The element of reasonableness is implicit in the proposition that "[W]hile the Act ... attempts to strike a balance between the disparate interests involved ... it must be remembered that the Act ultimately favors the debtor who invokes its protection." *In re Schmelzer*, 350 F.Supp. 429, 435 (S.D. Ohio 1972), aff'd, 480 F.2d 1074 (6th Cir. 1973). See also *Lines v. Frederick*, 400 U.S. 18, 91 S.Ct. 113, 27 L.Ed.2d 124 (1970); *Perez v. Campbell*, 402 U.S. 637, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971). It would clearly work against the interests of the Act and against the conscience of this Court to allow recovery by money lenders in cases where their claims are clearly based on unreasonable reliance.

■ American together with its predecessors is a nationwide company, which has been in business in Rhode Island for a substantial length of time. It is safe to assume that it has in its time made thousands of loans totaling in the hundreds of

thousands of dollars. Yet for all of its acknowledged expertise in business, the company asks this Court to accept the idea that it believed and relied on the genuineness of Mrs. Arden's signature. This is in spite of the fact that Mr. Arden represented that his wife was unable to come to the "office" when he nevertheless was always able to leave "obtain the necessary signature", and return to the office within the space of a few minutes. American further asks the Court to believe that the company does not regard as unusual the fact that an applicant for a loan is also considered to be so trustworthy that he or she can be relied upon as the sole source of crucial credit information regarding an always-absent cosigner. Nor is it unbusinesslike, in American's view apparently, to require that the same person who leaves the office in search of a signature in absentia be also the one to personally verify the co-signer's signature upon a return to the office.

These above described actions are not reasonable business practices and constitute a burying of one's commercial head in the sand. Such conduct and actions, I suppose, are available to the company for its own private purposes in giving its records apparent justification for granting a loan or an extension of credit, where perhaps none would be warranted or authorized if the true facts were set down in writing in the company's records.[3] However, such winking at the facts is not binding in this or any other Bankruptcy Court at dischargeability hearings where the situation will be scrutinized and characterized as it really is.

The Court's decision should in no way be construed as condoning Arden's reprehensible conduct. Neither, however, should American be allowed to complain of an act in which it participated to the point of encouraging Arden to somehow "obtain" his wife's "signature".

We are not dealing here with a loan made by one close friend or member of the family to another. This is an arms' length transaction; though it may be cloaked in terms of good will and cordiality, its purpose is a pure business one. American does not lend money in order to ease the path of the needy; it makes highly profitable loans at rates which invariably equal the legal limit of chargeable interest. This Court will not acknowledge American's casual business practices as "reasonable reliance."

The view taken by this Court with respect to the issue of alleged reliance by a lender is not unique. In a disturbingly typical situation, another bankruptcy court recently heard a case in which a finance company alleged that the bankrupts had understated their financial obligations at the time they borrowed money from it. The bankrupts contended and proved that the company official was informed of the correct amount of indebtedness. Nevertheless the company through its employee permitted a smaller list of creditors and a lesser amount to be inserted, saying that he only needed a general idea of the indebtedness and that he was in a hurry to get out of the office. The entire loan transaction took only ten minutes. *In re Bratland,* 1 B.C.D. 1354 (W.D.Wis. 1975). The Court found that the company could not have relied upon "or at least did not have a right to rely" on the financial statement and held the debt dischargeable. *Id.,* 1 B.C.D. at 1356. It has also been held that even a substantial omission from a financial statement of $100,000.00 in debts does not preclude dischargeability if a lender did not rely on the statement in making the loan. *In re Allvend Industries, Inc.,* 1 B.C.D. 1361 (S.D.N.Y. 1975).

In *Sweet v. Ritter Finance Co.,* supra, a finance company contended that the debtor had fraudulently failed to list all of his creditors as the instructions on the application had directed. The debtor, who had been doing business with the company for several years, could neither read nor write and was not asked any questions regarding possible unlisted creditors. The Court

---

**3.** For example: "This applicant states that he is unable to obtain the required co-signature—

therefore the loan application is denied."

deemed that the sole purpose of the document containing the list of creditors was to prevent dischargeability if the debtor went into bankruptcy. The Court said, "This willingness to lend with an almost studied disregard for the truth undoubtedly created by the high interest charged is enough in many instances to preclude a later claim by the loan company that its reliance on a false financial statement was reasonable." *Id.,* 263 F.Supp. at 542. The *Sweet* Court relied in part on *Excel Finance Mid City, Inc. v. Meilleur,* 137 So.2d 503 (La.App.1962), which held that where a company has been doing business with a borrower for many years and has the means to check financial responsibility but *closes its eyes,* it should be estopped from complaining of misrepresentation. (Emphasis Added)

Although the above cases deal with false financial statements rather than false signatures, the issue of reliance is the same. American was very familiar here with its debtor's record and could easily have checked the veracity of the information given it by other means. Yet its official encouraged the removal of these documents from the office for execution even after he had been clearly informed that Sarah Arden would not become involved in the loan. Nor did he attempt to call or otherwise ensure that she had signed, even when the bankrupt returned five minutes later with the "necessary signature."

The conclusion is inescapable that officials in the company knew that the signature of Mrs. Arden was false. I find that the signature in question was totally immaterial to the granting of the loan and that the only purpose of requiring the co-signature was to protest a possible future discharge in bankruptcy. *Cf. Bratland,* supra; *Sweet,* supra.

Based upon the foregoing findings of fact and conclusions of law, it is held that although the signatures were false, there was no fraud under Sec. 17(a)(2) of the Bankruptcy Act because the plaintiff has failed to show by clear and convincing evidence that the bankrupt acted with intent to deceive or that the company reasonably relied upon the false signatures.

The application of American Finance Corporation to have its debt declared nondischargeable is denied.

It is therefore ordered that judgment be entered for the defendant.